|  |  |  |
|---|---|---|
| NATALIE V., | ) | |
| | ) | |
| Plaintiff, | ) | No. 15 C 09174 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| HEALTH CARE SERVICE | ) | |
| CORPORATION, d/b/a/ BLUE CROSS | ) | |
| BLUE SHIELD OF ILLINOIS, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Natalie V. brings this action against Health Care Service Corporation (HCSC) under the Employee Retirement Income Security Act of 1974 (ERISA), seeking benefits related to her mental health treatment at a residential treatment center.[1] R. 1, Compl.[2] HCSC refused to pay for Natalie V.'s treatment because her group health plan excluded coverage for residential treatment centers. *Id.* ¶¶ 10, 12-13. Natalie V. now asserts that this exclusion violated the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008 (the Parity Act), which generally requires group health insurance plans to provide parity between mental health benefits and medical/surgical benefits. *Id.* ¶¶ 1, 11. HCSC now moves to dismiss the action under Federal Rule of Civil Procedure 12(b)(6) for

---

[1]This Court has subject matter jurisdiction over the case under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(a)(1)(B).

[2]Citations to the docket are indicated by "R." followed by the docket entry.

failure to state a claim. R. 18, Mot. to Dismiss. For the reasons stated below, the motion to dismiss is denied.

## I. Background

For purposes of this motion, the Court accepts as true the factual allegations in Natalie V.'s complaint. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Natalie V. is a 23-year-old Illinoisan who suffers from anorexia nervosa, general anxiety disorder, and major depressive disorder. Compl. ¶¶ 2, 6. In mid-2014, Natalie V. spent about three months at a residential treatment center in California to treat these disorders. *Id.* ¶¶ 7, 9. Although Natalie V. paid for her treatment upfront, she promptly submitted claims for reimbursement to HCSC. *Id.* ¶¶ 8, 9.

HCSC denied Natalie V.'s claims for the entirety of her treatment. Compl. ¶ 10. Natalie V.'s group health plan (call it "the Plan," for short) only covered treatment at residential treatment centers[3] for substance use disorders, not for mental illness:

---

[3]The Plan defines "Residential Treatment Center" as:

[A] facility setting offering therapeutic intervention and special programming in a controlled environment which also offers a degree of security, supervision and structure and is licensed by the appropriate state and local authority to provide such service. It does not include halfway houses, supervised living, group homes, boarding houses or other facilities that provide primarily a supportive environment, even if counseling is provided in such facilities. Patients are medically monitored with 24-hour medical availability and 24-hour onsite nursing service for patients with Mental Illness and/or Substance Use Disorders.

R. 18-1, Exh. 1 at 33, Health Care Service Corp. Health Care Benefit Program ("Plan") at 20.

EXCLUSIONS – WHAT IS NOT COVERED
Expenses for the following are not covered under your benefit program:
…
– Residential Treatment Centers, except for Inpatient Substance Use Disorders as specifically mentioned in this benefit booklet.

R. 18-1, Exh. 1 at 66-68, Health Care Service Corp. Health Care Benefit Program at 53-55.

After HCSC relied on the exclusion to reject coverage, Natalie V. appealed the denial, asserting that the Parity Act required the Plan "to cover [her] residential treatment as it would for treatment of any physical illness." Compl. ¶ 11. But again HCSC refused to pay for Natalie V.'s treatment on the grounds that the Plan excluded residential treatment for mental illness. *Id.* ¶ 12. After exhausting all administrative remedies (as required under ERISA), Natalie V. brought this action against HCSC. *Id.* ¶ 15. Natalie V. alleges that HCSC violated the Parity Act, which requires parity between mental health and medical/surgical benefits, by denying her claims for inpatient residential mental health treatment. *Id.* ¶ 13. Natalie requests relief for all past benefits due to her under the Plan, plus pre-judgment and post-judgment interest, as well as the costs and attorney's fees spent on this case. *Id.* at ¶¶ 17, 20.

## II. Standard of Review

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the … claim is and the grounds upon which it

rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (internal quotation marks and citation omitted). The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678-79.

### III. Analysis

This motion to dismiss boils down to one issue: whether the Parity Act required HCSC to cover Natalie V.'s residential treatment for her mental disorders. Analyzing this issue requires a bit of background on the Parity Act and the two sets of regulations—the "Interim Final Rules" (an oxymoron if there ever was one) and the Final Rules—that were issued to provide guidance to health insurance companies (like HCSC) on how to comply with the Parity Act. The next section

summarizes the Parity Act, the Interim Final Rules, and the Final Rules, *see* Section III.A., and then the Opinion moves onto analyzing whether Natalie V. has adequately stated a claim for relief, s*ee* Section III.B.

## A. The Parity Act

In an effort to increase the scope of coverage for mental illness treatment, Congress passed the Mental Health Parity Act in 1996. Pub. L. No. 104–204, 110 Stat. 2874 (1996); *Coal. for Parity, Inc. v. Sebelius*, 709 F. Supp. 2d 10, 13 (D.D.C. 2010). The Act required group health plans to provide the same aggregate lifetime and annual dollar limits for mental health benefits and medical/surgical benefits. Mental Health Parity Act of 1996 § 712.

Twelve years later, Congress passed the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008, which imposed additional parity requirements on group health plans. Pub. L. No. 110-343, 122 Stat. 3765 (2008) (codified as 29 U.S.C. § 1185a (ERISA); 42 U.S.C. § 300gg–5 (Public Health Service Act); and 26 U.S.C. § 9812 (Internal Revenue Code)). One important way that the Parity Act seeks to achieve parity is to mandate parity between the "treatment limitations" placed on mental health benefits and on medical/surgical benefits:

> In the case of a group health plan … that provides both medical and surgical benefits and mental health or substance use disorder benefits,[4] such plan or coverage shall ensure that—

---

[4]The Parity Act does not mandate that employers provide mental health benefits; but a group health plan with more than 50 employees that chooses to provide these benefits must do so to the same extent the plan provides medical/surgical benefits. *See* 29 U.S.C. § 1185a(c)(1)(B).

(ii) the treatment limitations applicable to such mental health or substance use disorder benefits are *no more restrictive* than the *predominant*[5] treatment limitations applied to substantially all medical and surgical benefits covered by the plan … and there are no separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits.

29 U.S.C. § 1185a(a)(3)(A)(ii) (emphases added).[6] The Parity Act goes on to define "treatment limitation" by referring to the scope and duration of treatment. Specifically, treatment limitation "includes limits on the frequency of treatment, number of visits, days of coverage, or other similar limits on the scope or duration of treatment." *Id.* § 1185a(a)(3)(B)(iii).

The Parity Act instructed the Secretaries of Labor, Health and Human Services, and Treasury (for convenience's sake, the "Departments") to issue

---

[5]A treatment limitation is considered "predominant" "if it is the most common or frequent of such type of limit." 29 U.S.C. § 1185a(a)(3)(B)(ii).

[6]The Parity Act also mandated parity between the "financial requirements" placed on mental health benefits and medical/surgical benefits:

In the case of a group health plan … that provides both medical and surgical benefits and mental health or substance use disorder benefits, such plan or coverage shall ensure that—

(i) the financial requirements applicable to such mental health or substance use disorder benefits are no more restrictive than the predominant financial requirements applied to substantially all medical and surgical benefits covered by the plan … , and there are no separate cost sharing requirements that are applicable only with respect to mental health or substance use disorder benefits[.]

29 U.S.C. § 1185a(a)(3)(A)(i). Under the Parity Act, "[t]he term 'financial requirement' includes deductibles, copayment, coinsurance, and out-of-pocket expenses … ." *Id.* § 1185a(a)(3)(B)(i). And "[a] financial requirement … is considered to be predominant if it is the most common or frequent of such type of … requirement." *Id.* § 1185a(a)(3)(B)(ii). Although HCSC makes a passing reference to the Parity Act's "financial requirements" provision, *see* Mot. to Dismiss at 2, neither side presents any substantive arguments as to that provision. So, at this stage, the Court does not address the "financial requirements" provision either.

"guidance and information" on the Parity Act's requirements. 29 U.S.C. § 1185a(g). Congress directed, however, that the Act would apply to all plans beginning on or after October 3, 2009, and Congress did not provide for a delay of the Parity Act even if the Departments had not yet issued the rules. Pub. L. No. 110-343, 122 Stat. 3765 (2008) (codified as 42 U.S.C. § 300gg–5 ("The amendments made by this section shall apply with respect to group health plans for plan years beginning after the date that is 1 year after the date of enactment of this Act [October 3, 2008] … ."); *see also* Preamble, Interim Final Rules Under the Parity Act, 75 Fed. Reg. 5410-01, 5411 (Feb. 2, 2010) ("The changes made by [the Parity Act] are generally effective for plan years beginning after October 3, 2009."); 29 C.F.R. § 2590.712 (amended Jan. 13, 2014).[7]

## 1. Interim Final Rules

In February 2010, four months after the Parity Act took effect, the Departments published the Interim Final Rules (IFRs). Preamble, IFRs, 75 Fed. Reg. 5410-01; 29 C.F.R. § 2590.712. The IFRs applied to "plan years beginning on or after July 1, 2010," Preamble, IFRs, 75 Fed. Reg. at 5410, and remained in effect until the Departments published the Final Rules in July 2014, *see* Preamble, Final Rules Under the Paul Wellstone and Pete Domenici Mental Health Parity and

---

[7]The current version of 29 C.F.R. § 2590.712 embodies the Final Rules, not the IFRs. When citing the IFRs throughout this Opinion, the Court has generally provided parallel citations to the *prior version* of 29 C.F.R. § 2590.712, which was in effect from April 5, 2010 to January 12, 2014, and the Preamble to the IFRs (embodied in the Federal Register). When citing to the Final Rules throughout this Opinion, the Court has generally provided parallel citations to the *current version* of 29 C.F.R. § 2590.712 and the Preamble to the Final Rules (embodied in the Federal Register).

Addiction Equity Act of 2008 (hereinafter "Final Rules"), 78 Fed. Reg. 68240-01 (Nov. 13, 2013); 29 C.F.R. § 2590.712(i).

The IFRs addressed the requirements for achieving parity of treatment limitations. Specifically, the IFRs explained that "the parity requirements for … treatment limitations are applied on a classification-by-classification basis." Preamble, IFRs, 75 Fed. Reg. at 5412. As a premise for the classification-by-classification regulation, the IFRs established six "classifications of benefits" for purposes of Parity Act compliance: (1) inpatient, in-network; (2) inpatient, out-of-network; (3) outpatient, in-network; (4) outpatient, out-of-network; (5) emergency care; and (6) prescription drugs. 29 C.F.R. § 2590.712(c)(2)(ii)(A); Preamble, IFRs, 75 Fed. Reg. at 5413. The Departments chose these classifications after observing that many plans already varied treatment limitations "based on whether a treatment is provided on an inpatient, outpatient, or emergency basis; whether a provider is a member of the plan's network; or whether the benefit is specifically for a prescription drug." Preamble, IFRs, 75 Fed. Reg. at 5413. While the regulations left it to group health plans to define, for example, "inpatient, outpatient, and emergency care," they did mandate that plans apply those terms "uniformly" for both mental health and medical/surgical benefits. *Id.*

The regulations also explained that group health plans had to provide the same treatment limitations for mental health and medical/surgical benefits within each classification and vis-à-vis each classification. 29 C.F.R. § 2590.712(c)(2)(ii)(A); Preamble, IFRs, 75 Fed. Reg. at 5413. So, a group health plan could not place a

treatment limitation on mental health benefits in a classification that was more restrictive than the predominant treatment limitation applied to medical/surgical benefits in that same classification. 29 C.F.R. § 2590.712(c)(2)(ii)(A); Preamble, IFRs, 75 Fed. Reg. at 5413. And, if a plan provided any benefits for a mental illness, the group health plan had to provide those benefits in each classification for which it provided any medical/surgical benefits.[8] 29 C.F.R. § 2590.712(c)(2)(ii)(A); Preamble, IFRs, 75 Fed. Reg. at 5413.

The six classifications generally applied to both "quantitative" and "nonquantitative" treatment limitations. 29 C.F.R. § 2590.712(a); Preamble, IFRs, 75 Fed. Reg. at 5412-13. A quantitative treatment limitation, as defined under the IFRs, is a limitation that is "expressed numerically (such as 50 outpatient visits per year) … ." 29 C.F.R. § 2590.712(a); *see also* Preamble, IFRs, 75 Fed. Reg. at 5412. By contrast, a nonquantitative treatment limitation is a limitation that "otherwise limits the scope or duration of benefits for treatment … ." 29 C.F.R. § 2590.712(a); Preamble, IFRs, 75 Fed. Reg. at 5412. Significantly, the IFRs established a standard for scrutinizing nonquantitative treatment limitations:

> A group health plan (or health insurance coverage) may not impose a nonquantitative treatment limitation with respect to mental health … benefits in any classification unless, … *any processes, strategies, evidentiary standards, or other factors* used in applying the nonquantitative treatment limitation to mental health … benefits in the classification *are comparable to,*

---

[8] To put it another way: "If a plan provides benefits for a mental health condition … in one or more classifications but excludes benefits for that condition … in a classification (such as outpatient, in-network) in which it provides medical/surgical benefits, the exclusion of benefits in that classification for a mental health condition … otherwise covered under the plan is a treatment limitation. *It is a limit, at a minimum, on the type of setting or context in which treatment is offered.*" Preamble, IFRs, 75 Fed. Reg. at 5413 (emphasis added).

and are applied no more stringently than, the processes, strategies, evidentiary standards, or other factors used in applying the limitation with respect to medical surgical/benefits in the classification[.]

29 C.F.R. § 2590.712(c)(4)(i) (emphases added); Preamble, IFRs, 75 Fed. Reg. at 5416.[9] In other words, as long as a health insurance company used comparable processes, strategies, evidentiary standards, or other factors when applying treatment limitations to *all* benefits in a group health plan, that plan was Parity Act-compliant. 29 C.F.R. § 2590.712(c)(4)(i); Preamble, IFRs, 75 Fed. Reg. at 5416. The "processes, strategies, evidentiary standards, or other factors" could not just be comparable "on their face"; rather, the group health plan had to apply them "in the same manner." Preamble, IFRs, 75 Fed. Reg. at 5416. This meant that when plans applied treatment limitations to mental health and medical/surgical benefits, "the mere fact of disparate results" did not mean that those limitations violated the Parity Act. *Id.*

Although the Departments provided much needed guidance on "nonquantitative treatment limitations" in the IFRs, they left one major issue unaddressed: the extent to which the Parity Act required that the "scope of services" that a plan offered for mental health conditions had to be on par with those offered

---

[9]The IFRs also provided an illustrative—not exhaustive—list of nonquantitative treatment limitations:

medical management standards; prescription drug formulary design; standards for provider admission to participate in a network; determination of usual, customary, and reasonable amounts; requirements for using lower-cost therapies before the plan will cover more expensive therapies (also known as fail-first policies or step therapy protocols); and conditioning benefits on completion of a course of treatment.

29 C.F.R. § 2590.712(c)(4)(ii); Preamble, IFRs, 75 Fed. Reg. at 5416.

for medical/surgical conditions. The term "scope of services" "generally refers to the types of treatment and treatment settings that are covered by a group health plan or health insurance coverage." Preamble, Final Rules, 78 Fed. Reg. at 68246. Though the Departments acknowledged that "not all treatments or treatment settings for mental health … correspond to those for medical/surgical conditions," they made clear that the IFRs did not address the scope of services issue and "invite[d] comments on whether and to what extent [the Parity Act] addresses the scope of services … provided by a group health plan … ." Preamble, IFRs, 75 Fed. Reg. at 5416-17.

## 2. The Final Rules

In November 2013, the Departments published the final regulations, which the agencies declared would apply to health-plan years beginning on or after July 1, 2014. Preamble, Final Rules, 78 Fed. Reg. 68240-01. The Final Rules retained the IFRs' standard for scrutinizing nonquantitative treatment limitations; that is, on a classification-by-classification basis, the processes, strategies, evidentiary standards, or other factors used to impose nonquantitative treatment limitations generally had to be applied in a comparable manner to both mental health and medical/surgical benefits. 29 C.F.R. § 2590.712(c)(4)(i); Preamble, Final Rules, 78 Fed. Reg. at 68244-45. According to the regulations, this standard provided flexibility for plans "to take into account clinically appropriate standards of care when determining whether and to what extent medical management techniques and other [nonquantitative treatment limitations] apply to medical/surgical benefits

11

and mental health … benefits … ." Preamble, Final Rules, 78 Fed. Reg. at 68245. This flexibility was necessary because plans did not have to use the *same* nonquantitative treatment limitations for all benefits; rather, it was just that the processes, strategies, evidentiary standards, and other factors plans used to impose those limitations had to be *comparable* for all benefits. 29 C.F.R. § 2590.712(c)(4)(i); Preamble, Final Rules, 78 Fed. Reg. at 68245. Despite acknowledging this flexibility, however, the Departments cautioned that "it is unlikely that a reasonable application of the [nonquantitative treatment limitation standard] would result in all mental health … benefits being subject to [a nonquantitative treatment limitation] in the same classification in which *less than all* medical/surgical benefits are subject to the [nonquantitative treatment limitation]." Preamble, Final Rules, 78 Fed. Reg. at 68245 (emphasis added). So, for example, a plan administrator would be hard-pressed to prove that a policy requiring prior authorization for all outpatient mental health benefits, but only prior authorization for just a few outpatient medical/surgical benefits, did not run afoul of the Parity Act.[10]

_____

[10]The Departments published this example in November 2011 to better explain the nonquantitative treatment limitations standard:

Question 5: I am an employer considering several health insurance policy options. One health insurance policy requires prior authorization for all outpatient mental health benefits but only a few types of outpatient medical/surgical benefits (outpatient surgery; speech, occupational and physical therapy; and skilled home nursing visits.) Is this permissible?

While some differences in plan requirements for prior authorization might be permissible based on recognized clinically appropriate standards of care, it is unlikely that the processes, strategies, evidentiary standards, and other factors considered by the plan in determining that those three (and only those three)

The Final Rules also addressed the "scope of services" issue—that is, the types of treatment or treatment settings that plans offer within each of the six classifications. It is important, for this case, that the regulations declared that the standard for scrutinizing nonquantitative treatment limitations applied to any restriction affecting the scope of services provided under the plan. Preamble, Final Rules, 78 Fed. Reg. at 68246-47 ("These final regulations also include additional examples illustrating the application of the [nonquantitative treatment limitation] rules to plan exclusions affecting the scope of services provided under the plan. The new examples clarify that plan or coverage restrictions based on geographic location, facility type, provider specialty, and other criteria that limit the scope or duration of benefits for services must comply with the [nonquantitative treatment limitation] parity standard under these final regulations."); 29 C.F.R. § 2590.712(c)(4). This meant that "intermediate" services, like residential treatment or intensive outpatient treatment, were subject to the Act's parity requirements. *See* Preamble, Final Rules, 78 Fed. Reg. at 68246 ("The Departments did not intend that plans and insurers could exclude intermediate levels of care covered under the plan from [the Parity Act's] parity requirements.").

---

outpatient medical/surgical benefits require prior authorization would also result in all outpatient mental health and substance use disorder outpatient benefits needing prior authorization.

United States Department of Labor, FAQs About Affordable Care Act Implementation (Part VII) and Mental Health Parity Implementation (Nov. 2011), *available at* http://www.dol.gov/ebsa/faqs/faq-aca7.html.

What's more, the regulations also confirmed that skilled nursing facilities are the medical/surgical "scope of services" analogue for residential mental health treatment centers:

> Plans and issuers must assign covered intermediate mental health … disorder benefits to the existing six benefit classifications in the same way that they assign comparable intermediate medical/surgical benefits to these classifications. For example, if a plan or issuer classifies care in skilled nursing facilities or rehabilitation hospitals as inpatient benefits, then the plan or issuer must likewise treat any covered care in residential treatment facilities for mental health … disorders as an inpatient benefit.[11]

Preamble, Final Rules, 78 Fed. Reg. at 68247; *see also id.* at 68273 (Example 9 illustrates why categorically excluding coverage for residential mental health treatment when covering comparable treatment settings for medical/surgical conditions violates the Parity Act). So, although the IFRs had left the "scope of services" question unanswered, the Final Rules made clear that plan restrictions based on types of treatment or treatment settings—like residential treatment

---

[11]Before issuing the Final Rules, the Departments investigated the economic and regulatory impact of the Parity Act, the IFRs, and the Final Rules. Preamble, Final Rules, 78 Fed. Reg. at 68253-54. In analyzing the costs attributable to the Final Rules, "the Departments d[id] not expect much change in how most plans consider intermediate behavioral health care in terms of the six existing benefit classifications." *Id.* at 68260. This is because the Departments found that group health plans already analogized residential treatment for mental health conditions to skilled nursing facilities for medical/surgical conditions:

> Moreover, the Departments investigated the patterns of classification of intermediate services and found that they are generally covered in the six classifications set out in the interim final regulations. Behavioral health intermediate services are generally categorized in a similar fashion as analogous medical services; for example, residential treatment tends to be categorized in the same way as skilled nursing facility care in the inpatient classification.

*Id.* In other words, the Final Rules only confirmed what group health plans had already determined, namely, that residential treatment centers are the mental health counterpart to skilled nursing facilities.

centers—must comply with the nonquantitative treatment limitation parity standard. 29 C.F.R. § 2590.712(c)(4); Preamble, Final Rules, 78 Fed. Reg. at 68246-47.

## B. Natalie V.'s Claim

With the statutory and regulatory framework set, the Court moves onto the question of whether HCSC's group health plan violated the Parity Act by categorically excluding mental health benefits for residential treatment. Remember, however, that Natalie V. was in residential treatment from June to September 2014,[12] Compl. ¶¶ 7, 9, which means that the IFRs, not the Final Rules, were the relevant regulations on Parity Act compliance when HCSC denied her mental health benefit claims. HCSC asserts that because the IFRs are silent on the "scope of services" issue, this actually means that those regulations "permitted health benefit plans to exclude from coverage certain 'treatment settings,' such as [residential treatment centers]." Mot. to Dismiss at 2; *id.* at 6-7; R. 22, Def.'s Reply Br. at 7-9. That the Final Rules "contain a *new* provision" establishing residential treatment centers as the mental health analogue to skilled nursing facilities for medical/surgical conditions further confirms, according to HCSC, that the IFRs did not require "scope of services" parity. Mot. to Dismiss at 7-8 (emphasis in original).[13]

---

[12]Natalie V.'s plan year began on January 1, 2014, so the IFRs, not the Final Rules, were the relevant resource for Parity Act compliance at the time her plan was in effect. Exh. 1 at 2, Certificate Rider; Preamble, Final Rules, 78 Fed. Reg. at 68240 ("The mental health parity provisions of these final regulations apply to group health plans and health insurance issuers for plan years … beginning on or after July 1, 2014.").

[13]IFRs and Final Rules aside, HCSC also maintains that the Parity Act itself does not mandate that group health plans cover expenses for residential treatment. Mot. to Dismiss at 5; Def.'s Reply Br. at 2-9. In its reply brief, HCSC asserts that under *Chevron,*

To be sure, a few courts have dismissed similar denial-of-benefit claims on the grounds that the Departments' refusal to address the "scope of services" issue in the IFRs is the equivalent of an agency interpretation *against* coverage for residential mental health treatment. *See, e.g., P. v. Catholic Health Initiatives*, 2016 WL 3551972, at *6 (W.D. Wash. June 30, 2016) (granting the defendant's motion for summary judgment after reasoning that "[t]he [IFRs] specifically invited further

---

*U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), this Court should conclude that based on the IFRs, group health plans could categorically exclude expenses for residential treatment centers before the Final Rules were published. Def.'s Reply at 2-9. In a nutshell, *Chevron* provides that when interpreting a statute administered by an agency, "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress"; but where "the statute is silent or ambiguous with respect to [a] specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." 467 U.S. at 842-43. So here, HCSC asserts that under *Chevron*, this Court should hold that the Parity Act does not apply to *nonquantitative* treatment limitations given that the Act's definition of "treatment limitations" identifies only *quantitative* treatment limitations, *see* 29 U.S.C. § 1185a(a)(3)(B)(iii) ("The term 'treatment limitation' includes limits on the *frequency* of treatment, *number* of visits, *days* of coverage, *or other similar limits* on the scope or duration of treatment" (emphases added)); *see also* Def.'s Reply Br. at 2-6 (asserting that two canons of statutory construction—*noscitur a sociis* and *ejusdem generis*—establish that the Parity Act's definition of "treatment limitation" applies to only quantitative, not qualitative, limitations on treatment). HCSC further contends that even if the Parity Act is ambiguous as to whether "treatment limitations" applies to nonquantitative limitations, this Court should follow the Departments' decision—as supposedly reflected in the IFRs—that treatment settings were not subject to any parity requirement before the Final Rules came about. Def.'s Reply Br. at 7-9.

But *Chevron* has no application here. This is because *Chevron* only applies where an agency has actually *answered* the specific issue that the statutory language itself does not address. 467 U.S. at 843 ("If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, *as would be necessary in the absence of an administrative interpretation*." (emphasis added)). In this case, the Departments specifically *declined* to address the "scope of services" issue. *See* Preamble, IFRs, 75 Fed. Reg. at 5416. In other words, there is no "administrative interpretation" for the Court to follow or to reject. And as discussed below, *see infra* at Section III.B. at 17-18, the Departments' refusal to address the "scope of services" issue does not constitute an endorsement of treatment-setting limitations. So, although at least one other district court has relied on *Chevron* to analyze whether the term "treatment limitation" under the Parity Act permits residential treatment center exclusions under the IRFs, *see Craft v. Health Care Serv. Corp.*, 2016 WL 1270433, at *8-10 (N.D. Ill. Mar. 31, 2016), the Court declines to do so here.

comment on this un-addressed issue, and the Final Rules require such coverage. But the [IFRs] did not."); Order Granting Defendants' Motion to Dismiss at 13-14, *S.S. v. Microsoft Corp. Welfare Plan et al.*, No. 2:14-cv-00351, Dkt. 49 (Feb. 11, 2015) (unpublished order) (granting the defendants' motion to dismiss after reasoning that "[t]he IFRs specifically noted that they did not address 'scope of treatment,' and recognized that residential treatment centers may not have a medical/surgical analog," and that "[the defendant] [wa]s entitled to rely on the [IFRs] to define and interpret the [Parity Act]."). These courts reasoned that the Final Rules introduced new treatment limitations—like types of treatment or treatment settings—that were not previously subject to the Parity Act's parity requirement. *Catholic Health Initiatives*, 2016 WL 3551972, at *6; Order Granting Defendants' Motion to Dismiss at 12-14, *S.S. v. Microsoft Corp. Welfare Plan et al.*, No. 2:14-cv-00351, Dkt. 49. So, those courts held, residential treatment center exclusions were legal under the IFRs. *Catholic Health Initiatives*, 2016 WL 3551972, at *6; Order Granting Defendants' Motion to Dismiss at 12-14, *S.S. v. Microsoft Corp. Welfare Plan et al.*, No. 2:14-cv-00351, Dkt. 49.

But there is a problem with relying on the IFRs to conclude that categorically excluding residential mental health treatment was legal under the Parity Act. The issue is whether the *Parity Act*—not the IFRs—permits a complete bar of all coverage for mental health treatment at residential treatment centers. The IFRs only offered "*guidance and information* … concerning the requirements of [the Parity Act]," 29 U.S.C. § 1185a(g) (emphasis added), and the IFRs did not purport to

affirmatively *authorize* health plans to exclude residential treatment centers for mental health treatment. Remember, the Departments refused to address the "scope of services" issue in the IFRs. *See* Preamble, IFRs, 75 Fed. Reg. at 5416. And despite HSCS's claim to the contrary, *see* Mot. to Dismiss at 6-7 ("This is the very question at issue in this case which the Departments answered by expressly deciding to not prohibit categorical exclusions of treatment settings at that time."); Def.'s Reply Br. at 7-9, that refusal does not constitute an endorsement of treatment-setting limitations. *Cf. Craft v. Health Care Serv. Corp.*, 84 F. Supp. 3d 748, 756 (N.D. Ill. 2015) (rejecting the defendant's due process defense and concluding that "[i]t would be a stretch to conclude from the Departments' request for comments that it was authorizing issuers to enforce treatment-setting limitations. They simply were not prepared to issue guidance at that time.").

To be sure, the IFRs did set a standard for evaluating nonquantitative treatment limitations set forth in the IFRs (and the Final Rules), *see supra* Section III.A.1-2 (the processes, strategies, evidentiary standards, or other factors used to impose nonquantitative treatment limitations generally have to be applied in a comparable manner to all benefits), and that standard will be applied in assessing whether HCSC lawfully excluded mental health benefits for residential treatment centers, *see infra* Section III.B. at 18-22. But where the IFRs do not answer a question one way or the other, it is the *Parity Act* that controls whether a group health plan provided mental health benefits in parity with medical/surgical benefits.

Instead of fixating on what the IFRs did not say about the "scope of services" issue, the focus should be on what those regulations did say about treatment limitations. First, the IFRs advised group health plans that they had to provide the same treatment limitations for mental health and medical/surgical benefits within each classification and vis-à-vis each classification. 29 C.F.R. § 2590.712(c)(2)(ii)(A); Preamble, IFRs, 75 Fed. Reg. at 5413. The IFRs further confirmed that the parity requirement extended to nonquantitative treatment limitations—limitations that "otherwise limit the *scope or duration of benefits for treatment* … ." 29 C.F.R. § 2590.712(a) (emphasis added); Preamble, IFRs, 75 Fed. Reg. at 5412. What's more, the IFRs also went so far as to caution group health plans that excluding mental health benefits in a particular classification in which the plan provided medical/surgical benefits would constitute a treatment limitation.[14] 29 C.F.R. § 2590.712(c)(2)(ii)(A); Preamble, IFRs, 75 Fed. Reg. at 5413. This is because a restriction like that would be "a limit, at a minimum, on the type of *setting or context in which treatment is offered.*" Preamble, IFRs, 75 Fed. Reg. at 5413 (emphasis added). At a minimum, then, the IFRs gave group health plan insurers like HCSC a heads-up that limitations on treatment settings were subject to the Parity Act. *Cf. Craft*, 84 F. Supp. 3d at 756 (observing that "[t]here was a foreseeable risk, then, that a court might construe the [Parity Act] to impose parity with respect to limitations on treatment settings.").

---

[14]This is assuming of course that the plan provided mental health benefits in other classifications in the first place. *See* Preamble, IFRs, 75 Fed. Reg. at 5413.

The IFRs also set forth a standard for determining whether a group health plan could impose a nonquantitative treatment limitation to mental health benefits. As noted earlier, the standard requires comparability in the process, strategies, evidentiary standards, and other factors applied in deciding what nonquantitative treatment limitations to impose:

> A group health plan … may not impose a nonquantitative treatment limitation with respect to mental health … benefits in any classification unless, … any processes, strategies, evidentiary standards, or other factors used in applying the nonquantitative treatment limitation to mental health … benefits in the classification are comparable to, and are applied no more stringently than, the processes, strategies, evidentiary standards, or other factors used in applying the limitation with respect to medical surgical/benefits in the classification[.]

29 C.F.R. § 2590.712(c)(4)(i); Preamble, IFRs, 75 Fed. Reg. at 5416. So if HCSC in fact used comparable processes, strategies, evidentiary standards, or other factors when analyzing whether it should categorically exclude residential mental health treatment, then there would be no Parity Act violation. For example, if HCSC applied an overall strategy to cover only those inpatient treatments (whether medical/surgical or mental health) with a particular success rate, and found after applying this criterion that residential mental health treatment would not meet that success rate (while treatment at skilled nursing facilities would), then excluding residential treatment centers would *not* violate the Parity Act. At this dismissal-motion stage, the complaint's allegations are assumed to be true, and all factual inferences are interpreted in favor of Natalie V. Viewed from that perspective, the complaint adequately alleges (this will be tested in discovery) that HCSC failed to apply comparable standards when it decided not to cover residential

treatment centers for mental illnesses. Natalie V. expressly put HCSC on notice of her contention that the Parity Act required coverage of the residential treatment; in January 2015, when appealing the denial of coverage, she wrote a letter that explicitly referred to the Parity Act. Compl. ¶ 11. Natalie V. alleges that HCSC then responded without any reasonable explanation for why the residential treatment center cost would not be covered, despite the Parity Act. *Id.* ¶ 13(b). Discovery will reveal what sort of process, strategy, evidentiary standard, or other factors HCSC used in setting its treatment limitations, including its blanket ban on residential treatment centers for mental illness. But based on the complaint's allegations, and the applicable legal principles, HCSC's motion to dismiss must be denied.

One final point is worth making now, because it will provide guidance for discovery. HCSC contends that "until the Departments … promulgated the Final Rules, certain intermediate services (like [residential treatment centers] and skilled nursing [facilities]) were deemed not to have clear analogues necessary for purposes of applying 'treatment limitation' guidelines and therefore were outside the reach of the [IFRs]."[15] Def.'s Reply Br. at 7. From HCSC's perspective, absent a "clear analogue[]" for residential treatment centers, HCSC could not have even applied the standard for determining whether nonquantitative treatment limitations placed on mental illness treatment settings violated the Parity Act.

But even if the Departments did not, in the defense's words, deem "certain intermediate services (like [residential treatment centers] and skilled nursing

---

[15]As the Court has already stated, whether or not facility types were "outside the reach of the [IFRs]," Def.'s Reply Br. at 7, does not matter because the Departments did not take a position on the issue. The scope of the Parity Act is what matters.

[facilities]) ... to have clear analogues" when the IFRs were in effect, Def.'s Reply Br. at 7, it appears that HCSC itself did. In fact, Natalie V.'s Plan classified both residential treatment centers and skilled nursing facilities as a type of "[i]npatient"[16] care. Exh. 1 at 33, Plan at 20 ("*Skilled nursing facility*" "means an institution … which is primarily engaged in providing comprehensive skilled services and rehabilitative *Inpatient* care … .") (emphases added); *id.* at 56, Plan at 43 ("*Inpatient* benefits … will also be provided for Substance Use Disorder Rehabilitation Treatment in a *Residential Treatment Center*." (emphases added)). This suggests that when Natalie V. received treatment in 2014, HCSC already had a medical/surgical analogue with which to compare any treatment limitation placed on residential mental health treatment.[17] This means, in turn, that HCSC would have had to use the same processes, strategies, evidentiary standards, or other factors to apply treatment limitations on inpatient mental health benefits like residential mental health treatment and on inpatient medical/surgical benefits like treatment at skilled nursing facilities. That Natalie V.'s Plan covered services received at skilled nursing facilities, *see* Exh. 1 at 55, Plan at 42, yet categorically excluded coverage for mental health benefits at residential treatment centers, *see id.* at 68, Plan at 55, could present a problem for HCSC. *See* Preamble, Final Rules,

---

[16]Remember that the IFRs had identified "inpatient, in-network," and "inpatient, out-of-network" as two of the six "classifications of benefits" for purposes of Parity Act compliance. *See* Preamble, IFRs, 75 Fed. Reg. at 5413; 29 C.F.R. § 2590.712(c)(2)(ii)(A); *see also supra* Section III.A.1 at 7.

[17]As discussed above, *see supra* Section III.A.2. at 13 n.11, the Departments also found, before issuing the Final Rules, that group health plans analogized residential treatment for mental health conditions to skilled nursing facilities for medical/surgical conditions. Preamble, Final Rules, 78 Fed. Reg. at 68253-54.

78 Fed. Reg. at 68245 ("[I]t is unlikely that a reasonable application of the [nonquantitative treatment limitation] requirement would result in all mental health or substance use disorder benefits being subject to [a nonquantitative treatment limitation] in the same classification in which *less than all* medical/surgical benefits are subject to the [nonquantitative treatment limitation]." (emphasis added)). But again, if HCSC can establish that it used the nonquantitative treatment limitation standard—that is, it used the same processes, strategies, evidentiary standards, or other factors when applying treatment limitations to all inpatient benefits—when deciding whether it could categorically exclude coverage for residential treatment centers, then Natalie V.'s Plan would not have run afoul of the Parity Act. For now, Natalie V. has adequately stated a claim and HCSC's motion to dismiss is denied.

### IV. Conclusion

For the reasons stated above, HCSC's motion to dismiss, R. 18, must be denied. In light of the denial of the motion, the parties shall update the initial status report, including conferring about a discovery plan consistent with this opinion. The updated status report is due by September 19, 2016. The status hearing of September 22, 2016, remains in place.

On a separate issue, the Court notes that Natalie V. filed this suit using a pseudonym for her last name. In the status report, the plaintiff shall address the propriety of proceeding with a pseudonym, citing specifically to Seventh Circuit authority that would permit a pseudonym in these circumstances. *See* Fed. R. Civ.

P. 10(a) (generally requiring the parties to proceed in their actual names); *Doe v. Blue Cross & Blue Shield United of Wis.*, 112 F.3d 869, 872 (7th Cir. 1997). The defense should also state its position in the status report.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 13, 2016